UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                     :

ROUTE 21 ASSOCIATES OF BELLEVILLE, INC.,    :

                                  :                  12 Civ. 5361 (PAE)

                          Appellant,    :

                                    :                  OPINION & ORDER

                   -v-                  :

                                    :

MHC, INC.,                                :

                                  :

                         Appellee.    :

                                  :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

    Route 21 Associates of Belleville ("Route 21") appeals from a decision of the Hon.

Robert E. Gerber, Bankruptcy Judge, in the liquidation proceedings of MHC, Inc. ("MHC"), (1)

denying Route 21's cross-motion for specific performance of the parties' agreements relating to

environmental clean-up; (2) denying Route 21's claim for administrative priority treatment for

past and future environmental clean-up costs; and (3) disallowing Route 21's general unsecured

claim for future clean-up costs.  For the reasons stated herein, that decision is affirmed.

I.      **Background**[1]

    **A.  The Parties and Relevant Events**

    MHC is one of several affiliates of Lyondell Chemical Company, each of which filed

voluntary Chapter 11 petitions on January 6, 2009.  MHC is the successor in interest to Kidde

Industries, Inc. (collectively, "the debtor").

---

[1] The Court's account of the underlying facts of this case, which are undisputed unless otherwise
indicated, is drawn from the appellate record ("AR").  The Court has reviewed the bankruptcy
court's recitation of the facts and has found no clear error.  *See* Fed. R. Bankr. P. 8013.

In March 1983, Route 21 purchased property in Belleville, New Jersey (the "Site") from the debtor.  AR 9, Ex. A.  In 1984, Route 21 learned of contamination at the Site; the debtor remediated that pollution, and warranted that the site was free of contamination.  AR 9, Ex. B at 1.  However, in 1991, an underground tank was discovered and found to be leaking contamination.  *Id.*  Route 21 then filed suit against the debtor under the New Jersey Spill Compensation and Control Act.  In June 1996, the parties reached a settlement agreement (the "1996 Agreement").  Under it, the debtor agreed to: (1) remediate the Site under the direction of the New Jersey Department of Environmental Protection ("NJDEP") to the extent necessary to obtain a "no further action" letter from NJDEP, *see* AR 9, Ex. C at 5–12; and (2) indemnify Route 21 for any environmental clean-up liability incurred as a result of the debtor's violations, *see id.* at 16–19.

As of 2004, that remediation work had not been fully performed.  Route 21 applied to NJDEP for an agreement under New Jersey's Brownfield and Contaminated Site Remediation Act, a statute intended to provide remediation and redevelopment of under-utilized or abandoned commercial sites to make them marketable to commercial purchasers.  *See* N.J.S.A. 58:10B-1 *et seq.*  On March 24, 2005, Route 21 entered into an agreement with NJDEP, *see* AR 9, Ex. D (the "Brownfield Agreement"), although it appears that NJDEP did not formally approve the agreement until sometime in 2006, *see* Appellant Br. 5.  The Brownfield Agreement provides, in pertinent part:

> 1. Route 21 . . . shall be entitled to reimbursement of 75% of the eligible costs associated with the NJDEP approved remedial action work plan for the

accelerated clean up in order to meet the requirements of Wal-Mart or similar purchaser with comparable tax revenues. . . . [2]

2. Route 21 . . . agrees to fulfill its commitments under the Memorandum entered into with the NJDEP for the environmentally sound and proper remediation of the Site, in accordance with the NJDEP approved remedial action work plan . . . and anticipates obtaining a NJDEP issued No Further Action letter for the site. . . .

3. Route 21 . . . agrees to implement and fund the remediation of the Site and to accordingly carry out and perform the work or undertaking necessary for this purpose under the supervision and approval of the NJDEP. . . .

4. Should Route 21 . . . decide not to proceed with the Project, Route 21 . . . shall notify the CEO/Secretary of its intent not to proceed . . . . Upon delivery of the notice, this Agreement shall be rendered null and void. . . .

7. Route 21 . . . has provided a good faith estimate of approximately $3,100,000.00 as to the remediation costs to be incurred pursuant to the Memorandum.

AR 9, Ex. D.  In short, Route 21 agreed to take over the clean-up work at the Site, and NJDEP agreed to reimburse Route 21 for 75% of the costs it incurred in doing so.

In December 2007, Route 21 and the debtor added an addendum to the 1996 Agreement (the "2007 Addendum"),[3] to take into account the Brownfield Agreement.  The 2007 Addendum provides, in pertinent part:

2.  . . . As a result of the Brownfield Agreement, Route 21 agrees to complete the RI [remedial investigation] under the direction of NJDEP.  Route 21 will remediate the soils as requested by NJDEP . . . to obtain a "No Further Action" letter for the soils.  Route 21 also agrees to perform the work necessary to complete the RI for the groundwater . . . and obtain approval by NJDEP of a remedial action workplan ("RAW") for the groundwater at the Site.  Route 21's undertakings hereunder are not conditioned upon the closing of the Lowe's transaction.

---

[2] The Brownfield Agreement refers to Wal-Mart and, as noted *infra*, a 2007 Addendum refers to Lowe's.  These and other retail chains were at various points involved in negotiations to purchase the property.  *See* Transcript of Oral Argument ("Tr.") at 4.

[3] The Court will at times refer to the 1996 Agreement, the Brownfield Agreement, and the 2007 Addendum collectively as "the agreements."

3

3.  Within forty-five (45) days after approval of the RAW by NJDEP, Route 21 shall implement the RAW for groundwater . . . .  In the event that the RAW is ongoing at the time of the closing of the sale to Lowe's (or any other proposed transferee), MHC shall complete the RAW for groundwater and obtain a "No Further Action" letter (or its substantial equivalent) for groundwater. . . .

5.  MHC will be responsible to maintain all monitoring wells, recovery wells, vapor recovery systems or other treatment facilities constructed or installed in accordance with the approved groundwater RAW and to remove same at such time as NJDEP permits or requests such removal. . . .

7.  As for off site disposal of materials, MHC agrees to sign certifications reasonably required by disposal sites, provided that the disposal site has been or is audited by MHC and deemed acceptable to MHC in its discretion. . . .

9.  The Brownfield Agreement provides that Route 21 shall be entitled to reimbursement of up to 75% of all approved costs. . . . MHC agrees to reimburse Route 21 for the remaining 25% of necessary and proper response or remediation costs incurred by Route 21.

AR 9, Ex. E.  To summarize:  Route 21 agreed to (1) complete the remedial investigation for the groundwater and obtain approval of a RAW, regardless of the closing of a contemplated sale of the property to Lowe's, and (2) implement the RAW for groundwater up until such time as the sale to Lowe's or some other transferee was completed.  The debtor, on the other hand, agreed to (1) reimburse Route 21 for the 25% of its approved costs which Route 21 was responsible for under its agreement with NJDEP, (2) take on responsibility for maintaining monitoring wells and certain other facilities, (3) sign certifications required by off-site disposal sites, and (4) in the event that the sale to Lowe's were to close, assume responsibility for completing the RAW for groundwater and obtaining a "No Further Action" letter.

The sale to Lowe's never closed.  Route 21 still owns the property.  AR 9 at 19; Appellant Br. 21; Tr. 31–32.

On January 6, 2009, the debtor filed a voluntary chapter 11 petition.

4

On June 26, 2009, Route 21 filed a proof of claim against the debtor's estate, seeking $1,049,497.10 as an administrative expense.  AR 16.  That claim consisted of:  (1) $533,762.10, representing 25% of the costs approved by NJDEP for Route 21's soil remediation work as of January 5, 2009; (2) $261,569, representing 25% of the costs incurred by Route 21 on the preliminary groundwater work; and (3) $254,166, representing costs incurred by Route 21 on account of the disposal sites chosen by MHC.[4]  *Id.*; *see also* Tr. 18–23.  In the rider attached to this claim, Route 21 specified that it was continuing to perform its duty to remediate the groundwater, and that its preliminary estimate of that cost was $6.6 million, of which the debtors would be responsible for $1.65 million.  *Id.*  Route 21 also asserted that the agreements between it and the debtor were executory.  *Id.*

On June 29, 2009, NJDEP filed a proof of claim against the debtor's estate for more than $19 million in environmental clean-up costs that it had incurred or will incur at a number of sites, including the site at issue here.  AR 17.

On March 30, 2010, Route 21 submitted its completed remedial investigation and proposed RAW to NJDEP.  NJDEP approved the plan on February 21, 2011.  AR 9, Ex. J.

On April 16, 2010, Judge Gerber approved a stipulation between Route 21, NJDEP, and the debtor's corporate parent, under which the parties agreed that "[i]f any claims are allowed on account of the Debtor's alleged environmental liability in relation to [the Site], which Debtor disputes, the allowed claim(s) shall be treated as one claim."  AR 5 ¶ 1.  Route 21 and NJDEP agreed that if any such claim were allowed, they would "agree between themselves as to the

---

[4] In the 2007 Addendum, MHC had agreed that if it desired a particular method of disposal that was more costly, it would pay Route 21 the differential cost.  AR 9, Ex. E at 3.

allocation of any such distribution." *Id.* ¶ 2.  Route 21 reserved the right to amend its claims, and the debtor reserved the right to raise claim objections. *Id.* ¶¶ 3–4.

On April 23, 2010, Judge Gerber approved the Third Amended and Restated Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors (the "Plan"); it became effective on April 30, 2010.  AR 22.  Under the Plan, the Millennium Custodial Trust (the "Trust") was formed.  *Id.* § 5.5.  The Trust became the parent of certain former debtor affiliates of Lyondell, including MHC.  The Trust was tasked with liquidating the assets of these debtors, and it was given authority to file objections to proofs of claims.  *Id.*  Under the Plan, MHC rejected many of its executory contracts, including the agreements at issue here.[5]  *Id.* § 9.1.

On January 5, 2011, Route 21 filed a second proof of claim, amending its initial claim to seek $1,133,526.66, also as an administrative expense.[6]  AR 7.  It is unclear what accounts for the $84,029.56 difference between this claim and Route 21's initial claim, because the riders to the two claims are identical.  *Compare id.*, *with* AR 16.  However, according to Route 21, the additional costs reflect expenses incurred by Route 21 between the filing of its initial claim and September 2009.  AR 11 at 9; AR 12 at 29.  Therefore, at least some of the expenses claimed by Route 21 were incurred after the filing of the petition.  In Route 21's amended claim, it reiterated that its estimated cost of the debtor's share of remediation work was $1.65 million, and that the agreements between it and the debtor were executory.  AR 7.

---

[5] Route 21 disputes that the agreements were rejected by the Plan, but the Court finds that they were.  *See infra* Part III(A)(2).

[6] In the bankruptcy court proceeding, the debtor contested the timeliness of Route 21's amended claim.  Judge Gerber found the claim timely; the debtor has not raised the issue here.

On April 28, 2011, the Trust, on behalf of the debtor, objected to both of Route 21's claims. AR 8.  On May 12, 2011, Route 21 filed a response and a cross-motion seeking specific performance of the agreements.  AR 9.

On June 28, 2011, NJDEP's claim was allowed as a general unsecured claim for $3,034,195.  *See* AR 25 at 2.

**B.   The Bankruptcy Court's Decision**

On September 23, 2011, Judge Gerber held a hearing on Route 21's claims and the Trust's objections to them.  AR 12 (transcript of hearing).  On April 17, 2012, Judge Gerber issued his bench opinion.  AR 13 (transcript of opinion) ("Op.").

First, Judge Gerber denied Route 21's cross-motion for specific performance.  He found that the agreements between Route 21 and the debtor, including as to the future clean-up of the Site, were executory contracts that had been deemed rejected by the debtor.  Judge Gerber rejected Route 21's argument that the debtor should nonetheless be compelled to perform the agreements.  Op. 6–11.

Second, Judge Gerber found that no part of Route 21's claim is entitled to administrative priority, because the agreements were pre-petition transactions that do not provide a direct benefit to the debtor's post-petition estate.  Op. 11–17.

Finally, Judge Gerber allowed Route 21's general unsecured claim for costs already incurred in cleaning up the Site.  The parties later stipulated that these costs total $1,019,358.40. AR 15 at 2.  However, Judge Gerber disallowed Route 21's claims for costs not yet incurred or paid.  He found that such costs are contingent claims for reimbursement, on which Route 21 is co-liable with the debtor.  Op. 17–25.

On May 18, 2012, Judge Gerber issued an Order reflecting these rulings.  AR 15.  Route 21 filed a timely notice of appeal.  Dkt. 1.

On July 30, 2012, Route 21 filed its brief in this Court.  Dkt. 4 ("Appellant Br.").  On August 17, 2012, the debtor filed a brief in response.  Dkt. 6 ("Appellee Br.").  On August 30, 2012, Route 21 filed a brief in reply.  Dkt. 7 ("Appellant Reply Br.").  On November 27, 2012, the Court heard extended oral argument.

## II.    Legal Standard

On appeal from a matter within the bankruptcy court's core jurisdiction, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  "Findings of facts, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous."  *Id.*; *see also Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 91 (2d Cir. 2010).  The bankruptcy court's legal conclusions "are reviewed *de novo*."  *In re Kalikow*, 602 F.3d at 91 (citing *In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000)).

## III.   Discussion

The Court addresses, in turn, Judge Gerber's (1) denial of Route 21's cross-motion to compel specific performance; (2) denial of Route 21's claim for administrative priority treatment for past and future clean-up costs; and (3) disallowance of Route 21's general unsecured claim for future clean-up costs.

### A.  Specific Performance

In denying Route 21's cross-motion, Judge Gerber found that the agreements were executory contracts, that they had been rejected under the plan, and that specific performance of

those agreements need not be compelled.  Op. 6–11.  On appeal, Route 21 disputes each of these

holdings.  For the reasons that follow, the Court agrees with each holding.

### 1.   Were the Agreements Executory?

Under the Bankruptcy Code, the Trustee may, with court approval, reject any executory

contract, with exceptions not pertinent here.  11 U.S.C. § 365(a).  The Code does not define the

term "executory."  The legislative history states that "[t]hough there is no precise definition of

what contracts are executory, it generally includes contracts on which performance remains due

to some extent on both sides."  H.R. Rep. No. 95–595, at 347 (1977), *reprinted in* 1978

U.S.C.C.A.N. 5963, 6303; S. Rep. No. 95–989, at 58 (1978), 1978 U.S.C.C.A.N. 5787, 5844.

Most courts have adopted Professor Countryman's definition of an executory contract: one for

which both parties' obligations "are so far unperformed that the failure of either to complete

performance would constitute a material breach excusing performance of the other."  Vern

Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *see

also In re Riodizio, Inc.*, 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997) (collecting cases adopting

this definition).  However, some courts have found this definition too static; they have adopted a

"functional approach" under which "the question of whether a contract is executory is

determined by the benefits that assumption or rejection would produce for the estate."  *Id.* at 422

(quoting *Sipes v. Atl. Gulf Cmtys. Corp.*, 84 F.3d 1364, 1375 (11th Cir. 1996)); *see also id.*

(collecting cases adopting a functional approach).  The functional approach is "generally viewed

as more flexible and lenient."  *In re WorldCom, Inc.*, 343 B.R. 486, 493 (Bankr. S.D.N.Y. 2006).

The Second Circuit has not resolved this issue.  It has described an executory contract as

one "on which performance remains due to some extent on both sides."  *In re Ionosphere Clubs,

Inc.*, 85 F.3d 992, 998–99 (2d Cir. 1996).  But in *In re Ionosphere Clubs*, the Second Circuit was

9

"not called upon to address the question of how much performance must be outstanding for the contract to be treated as executory under § 365," and it has subsequently declined to "determine the precise contours of the test for executoriness." *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008); *see also In re Bradlees Stores, Inc.*, No. 01 Civ. 3934 (SAS), 2001 WL 1112308, at *7 (S.D.N.Y. Sept. 20, 2011) (collecting cases in this district that have applied the Countryman and/or the functional approaches).

In his ruling from the bench, Judge Gerber assumed that the agreements were executory, because the parties agreed that they were.[7]  That assumption was consistent with Route 21's repeated assertions that the agreements are executory. *See, e.g.*, AR 16 (Route 21's initial proof of claim, filed June 26, 2009); AR 7 (Route 21's amended proof of claim, filed January 5, 2011); AR 9 at 7 (Route 21's response to debtor's claim objection, filed May 11, 2011).  Nevertheless, on appeal, Route 21 argues for the first time that the contract was no longer executory as of the effective date of the Plan, because Route 21, on March 30, 2010, had fully discharged its obligations. *See* Appellant Br. 17–18.

The debtor argues that Route 21 has waived its right to make this argument, because Route 21 took the opposite position below and first made this argument on appeal to this Court. Appellee Br. 10.  "It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quoting *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994)).  "The law in this

---

[7] Judge Gerber twice stated that the parties agreed that the contracts are executory. *See* Op. 6 ("the agreements, which the parties agree are executory contracts"); *id.* at 7 ("the parties agree that the agreements between Route 21 and the debtors are executory contracts with ongoing obligations").  Although he appeared to contradict himself on this point, *see id.* at 7 ("if I said 'are,' I think I meant 'aren't'"), the context of the opinion is clear that Judge Gerber assumed the parties to have agreed that the agreements were executory, *see id.* at 7–9.  Notably, no party disputed Judge Gerber's statement that the parties agreed that the agreements were executory.

Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, . . . waiver will bar raising the issue on appeal." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006) (quoting *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977)).  Although usually articulated in the context of an appeal from a district court's order, these principles also apply where a party appeals a bankruptcy court order to the district court.  *See, e.g.*, *Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.*, 402 F. App'x 634, 636 n.1 (2d Cir. 2010) (summary order) (affirming district court's finding that appellant failed to preserve argument before the bankruptcy court). However, because waiver is a prudential doctrine, courts have discretion to consider waived arguments and will exercise this discretion "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Bogle-Assegai*, 470 F.3d at 504 (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005)).

Route 21 urges the Court to exercise that discretion, explaining that its changed position is the result of NJDEP's delay in approving the RAW:  Route 21 submitted its material for the approval of the RAW on March 30, 2010, but NJDEP did not approve the plan until February 21, 2011.  Thus, in the interim, the debtor argues, Route 21 was constrained to argue that the agreements were executory, because whether it owed further performance turned on whether NJDEP proved to be satisfied with the preparatory work that Route 21 had performed.  Appellant Reply Br. 6–8; Tr. 85.  Assuming, *arguendo*, that Route 21 completed all the performance owed under the agreements when it submitted the proposed RAW to NJDEP on March 30, 2010—and that the completion of this performance is properly marked by the date of the submission of the RAW, not its approval—this might have been a plausible explanation for Route 21's changed

11

position. But, importantly, in a brief filed with the bankruptcy court on May 11, 2011, some three months *after* Route 21 got approval from NJDEP, Route 21 *continued* to assert that the agreements were executory. AR 9 at 7. Therefore, Route 21 cannot claim "manifest injustice." *See Bogle-Assegai*, 470 F.3d at 504. Because of Route 21's shifting positions, its argument that the agreements were not executory is waived. *See Paese*, 449 F.3d at 446.

In any event, Route 21's argument fails on the merits. The 2007 Addendum provides that: "Route 21 shall implement the RAW for groundwater . . . . In the event that the RAW is ongoing at the time of the closing of the sale to Lowe's (or any other proposed transferee), MHC shall complete the RAW for groundwater . . . ." AR 9, Ex. E ¶ 3. The sale to Lowe's, or any other proposed transferee, never occurred. AR 9 at 19; Appellant Br. 21; Tr. 31–32. Thus, the express terms of the parties' agreements contemplate that Route 21 maintained continuing obligations for implementing the groundwater RAW.[8] That is consistent with Route 21's repeated assertions about its ongoing obligations under the agreements. These obligations are clearly material. Therefore, the agreements were "executory," even under the more demanding Countryman approach. *See In re Bradlees Stores*, 2001 WL 1112308, at *7 (court need not review "more lenient Functional Approach" where contract is found to be executory under "more stringent Countryman test").

---

[8] In arguing to the contrary in its brief in this Court, Route 21 asserts that the debtor, not Route 21, "was obligated 'to complete the RAW for groundwater and obtain a 'No Further' Action letter (or is substantial equivalent) for groundwater.'" Appellant Br. 8 (quoting AR 9, Ex. E ¶ 3). In making this unqualified assertion, Route 21 misleadingly omits the first half of that sentence, which reads: "*In the event that* the RAW is ongoing at the time of the closing of the sale to Lowe's (or any other proposed transferee) . . . ." AR 9, Ex. E ¶ 3 (emphasis added).

12

### 2.   Were the Agreements Rejected?

Section 9.1 of the Plan provides that all executory contracts would be deemed rejected by the debtor as of the Plan's effective date, except for, *inter alia*, "any executory contract . . . that is the subject of a motion by the Debtors to assume or reject that is pending as of the Effective Date." AR 22 at 72.  The Plan's effective date was April 30, 2010.  Before the bankruptcy court, Route 21 argued that the agreements were not rejected, because either Route 21's claim, the debtor's objection to that claim, or the April 16, 2010, stipulation between Route 21, NJDEP and the debtor fell within the ambit of this exception.  Judge Gerber rejected that argument.  Op. 7–9.

On appeal, Route 21 first raised this argument in its reply brief, *see* Appellant Reply Br. 6, and made only a brief allusion to it at argument, *see* Tr. 6–7.  Although the Court need not consider arguments first raised in a reply brief, *see Thomas v. Roach*, 165 F.3d 137, 145–46 (2d Cir. 1997), that policy exists "to protect a party from unfair surprise by a legal argument that has not been researched and addressed."  *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 648 n.9 (S.D.N.Y. 2011).  In this case, because Route 21 raised and the parties briefed the argument below, the debtor does not suffer unfair surprise.  Even if it did, the debtor need not fret:  Route 21's argument is frivolous.  Route 21's proof of claim cannot be deemed a "motion by the Debtors."  And the debtor's objection to that claim says nothing about assumption or rejection. AR 2.  Finally, nothing in the April 16, 2010, stipulation concerns the assumption or rejection of the agreements.  AR 5.  Therefore, the agreements were properly rejected under the Plan.

### 3.   Is Specific Performance Required?

Route 21 argues that it is entitled, under New Jersey law, to the equitable remedy of specific performance, and that this remedy is not a "claim" that is dischargeable in bankruptcy. Appellant Br. 10–13.  In response, the debtor argues that Route 21 is not entitled to specific

13

performance under New Jersey law, because its claims can be monetized, and that, in any event, such a remedy is a "claim" that is discharged in bankruptcy.  Appellee Br. 12–17.

When an executory contract is rejected under section 365 of the Bankruptcy Code, it is treated as if the contract had been breached immediately before the date of the bankruptcy petition's filing; any claim arising from that breach is therefore a prepetition claim.  *See* 11 U.S.C. § 502(g)(1).  A "claim" is defined to include a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."  11 U.S.C. § 101(5).  The bankruptcy court's confirmation of a plan of reorganization discharges the debtor from liability on such claims, leaving the creditor with only a distribution under the plan of the *pro rata* value of the claim.  *See* 11 U.S.C. § 1141(d)(1)(A).  By contrast, when the debtor owes an obligation that is *not* a "claim," that obligation is not discharged in bankruptcy, and therefore the debtor retains the obligation despite its bankruptcy filing.  *See In re Manville Forest Prods. Corp.*, 209 F.3d 125, 128 (2d Cir. 2000).  In sum, whether an equitable remedy, such as specific performance, is a "claim" that can be discharged in bankruptcy turns on whether that remedy "gives rise to a right to payment."

Route 21, in arguing that its alleged right to specific performance does not give rise to a right to payment, makes three distinct arguments.  First, Route 21 directs the Court to a line of cases involving environmental clean-up obligations imposed by statutory injunction.  As Route 21 notes, in some of those cases the debtor's clean-up obligations were held to be non-dischargeable.  That, however, was because the statutes giving rise to these obligations did not allow the claimant to seek monetary reimbursement for clean-up work performed; here that limitation is not present.  Second, Route 21 cites several cases in which other, non-statutory equitable obligations were held to be non-dischargeable.  However, in those cases, monetary

14

damages were not a "viable alternative" to the equitable remedy.  By contrast, the right to specific performance is generally converted into a monetary damages claim in bankruptcy, and there is no impediment to that here.  Third, Route 21 argues that its claims cannot be assigned an estimated monetary value, but Route 21 has taken the contrary position in this litigation, and its claims are, in fact, monetizable.  The Court addresses these arguments in turn.

### a) Environmental Clean-Up Injunctions

A seminal case in this area, particularly relevant in light of the context of this case, is *Ohio v. Kovacs*.  There, Ohio had obtained an injunction ordering Kovacs to clean up a hazardous waste site.  469 U.S. 274 (1985).  Kovacs did not comply with the injunction, and a receiver was appointed to take possession of his property.  *Id.* at 276.  Kovacs later filed for personal bankruptcy, whereupon Ohio sought in bankruptcy court a declaration that Kovacs' duty to clean up the site was not dischargeable because it was not a "claim."  *Id.* at 277.  Ohio argued that "Kovacs' default was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim," and that "Kovacs' breach of his obligation under the injunction did not give rise to a right to payment."  *Id.* at 279.

The issue ultimately reached the Supreme Court, which rejected Ohio's argument.  It found "no indication in the language of the statute that the right to performance cannot be a claim unless it arises from a contractual arrangement."  *Id.*  Rather, reviewing the text and drafting history of the Bankruptcy Code, the Court found it "apparent that Congress desired a broad definition of 'claim.'"  *Id.*; *see also Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("We have previously explained that Congress intended by this language to adopt the broadest available definition of 'claim.'").  Because Ohio had dispossessed Kovacs of the property, the Court determined that what Ohio was really seeking was money to defray clean-up costs.  *Id.* at

283.  Accordingly, the Court held, Ohio's equitable remedy was one that gave rise to a right to payment, which made it a dischargeable "claim."

Route 21 notes that, in a number of post-*Kovacs* cases, courts have interpreted the definition of "claim" to exclude the debtor's duty to clean up pollution under certain environmental statutes.[9]  Appellant Br. 14–17.  But these cases are all distinguishable, because none entailed a remedy that gave rise to a right to monetary payment:  Each involved a debtor subject to equitable obligations imposed by a statute that did not allow the claimant to seek monetary reimbursement from the debtor.  By contrast, here, the debtor's obligation arises from a private contract that contains no such limitation.

Specifically, in *United States v. Apex Oil Co.*, the Environmental Protection Agency ("EPA") had brought suit against the debtor under the Resource Conservation and Recovery Act of 1976 ("RCRA") and obtained an injunction requiring the debtor to clean up a contaminated site.  579 F.3d 734, 735 (7th Cir. 2009).  The question before the Seventh Circuit was whether this obligation could be discharged in the debtor's bankruptcy.  The court found that RCRA does not entitle the plaintiff to clean up the pollution itself and then seek monetary reimbursement from the defendant; rather, RCRA entitles the plaintiff "only to require the defendant to clean up the contaminated site at the defendant's expense."  *Id.* at 736–37.  Accordingly, the debtor's obligation, imposed by an injunction obtained under RCRA, could not be said to "give rise to a right to payment," and therefore was not a "claim" that could be discharged in bankruptcy.  *Id.*

---

[9] In ruling that these duties were not dischargeable in bankruptcy, these courts grappled with the conflicting goals of bankruptcy, which seeks to provide a debtor with a "fresh start," and the federal environmental statutes, which seeks to prioritize environmental remediation.  *See In re Chateaugay Corp.*, 944 F.2d 997, 1002 (2d Cir. 1991).

Similarly, in *In re Torwico Elecs. Inc.*, the debtor owed clean-up obligations to the state of New Jersey pursuant to an administrative order.  8 F.3d 146, 147 (3d Cir. 1993).  The state had issued that order "under statutory sections which do not allow the state to perform the cleanup and then sue for reimbursement of the costs."  *Id.* at 151 n.6.  Accordingly, the court held that "[t]he state has no 'right to payment' here.  What it has is a right to force the debtor to comply with applicable environmental laws by remedying an existing hazard."  *Id.* at 150.  Such a right, the court held, does not constitute a "claim" that is dischargeable in bankruptcy.  *Id.* at 151.

The decision in *In re Chateaugay Corporation* underscores that the existence of a "right to payment" is the decisive factor in this line of cases.  944 F.2d 997, 999 (2d Cir. 1991) Whereas in *Apex Oil* and *Torwico* the equitable obligations arose under statutes that did not permit the government to seek monetary reimbursement from the debtor, the environmental statute at issue in *Chateaugay* did permit the government to pursue such relief.  There, the EPA sought reimbursement from the debtor under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), for response costs the EPA had incurred due to pollution at several sites owned by the debtor.  *Id.* at 997.  The relevant provisions of CERCLA gave the EPA the option of either (1) ordering the responsible party to take the remedial action, or (2) taking the remedial action itself, and then seeking reimbursement for those costs.  *Id.* at 1000.  The Second Circuit held that, because the EPA had the option to do the clean-up itself and sue for response costs, it had a "right to payment" and thus a "claim" that was discharged in bankruptcy.  *Id.* at 1008.

The Second Circuit, in *Chateaugay*, drew another important distinction that is relevant here.  It noted that environmental clean-up obligations often accomplish "dual objectives of

removing accumulated wastes and stopping or ameliorating ongoing pollution." *Id.*  And, the

court noted, although an order concerning remediation of past pollution may or may not qualify

as a claim depending whether there is a "right to payment," an injunction against ongoing

pollution cannot be a claim:

> Since [the EPA has] no option to accept payment in lieu of continued pollution,
> any order that to any extent ends or ameliorates continued pollution is not an
> order for breach of an obligation that gives rise to a right of payment and is for
> that reason not a "claim."  But an order to clean up a site, to the extent that it
> imposes obligations distinct from any obligation to stop or ameliorate ongoing
> pollution, is a "claim" if the creditor obtaining the order had the option, which
> CERCLA confers, to do the cleanup work itself and sue for response costs,
> thereby converting the injunction into a monetary obligation.

*Id.*; *see also Kovacs*, 469 U.S. at 285 ("[W]e do not hold that the injunction against bringing

further toxic wastes on the premises or against any conduct that will contribute to the pollution of

the site or the State's waters is dischargeable in bankruptcy.").[10]

　　　*Apex Oil*, *Torwico*, and *Chateaugay* can therefore be synthesized, as one court in this

district has noted, to establish that "the proper test for determining whether an enforcing agency

has a 'right to payment' under section 101(5)(b) for an environmental injunction is to consider

whether the enforcing agency has a right to cleanup and recover response costs under the statute

pursuant to which the enforcing agency has obtained its injunction."  *In re Mark IV Industries,*

*Inc.*, 459 B.R. 173, 186 (S.D.N.Y. 2011).

---

[10] Route 21 attempts to leverage *Chateaugay* to its benefit, by seizing on snippets in that decision
to the effect that injunctive obligations to refrain from *ongoing* pollution are not monetizable
claims.  But that portion of the Second Circuit's analysis is inapposite here.  Although Route 21
alleges that there is ongoing pollution at the Site, nothing in the parties' agreements resembles an
order imposed by the state or a court that enjoins continued pollution.  Rather, the agreements
here serve to allocate their obligations to clean up and pay for *existing* contamination.  These
agreements fall comfortably on the "claim" side of the distinction drawn by the Second Circuit.
*Id.* at 1008.

Of course, the party seeking specific performance here, Route 21, is not an enforcing agency, but a private claimant. Judge Gerber appeared to reject Route 21's argument on this distinction alone, stating: "Each of these cases involved regulatory authorities with police powers capable of ordering others to act. Route 21, as a private corporation, has no such police powers." Op. 10. Disputing Judge Gerber's analysis, Route 21 directs this Court to *AM International Inc. v. Datacard Corp.*, in which a private claimant had obtained, before the debtor's bankruptcy, an order from the district court requiring the debtor to clean up a polluted site. 106 F.3d 1342 (7th Cir. 1997). The Seventh Circuit held that this claim does not "give rise to a right to payment" and is not dischargeable. *Id.* at 1348. *AM International* suggests that the distinction relied on by Judge Gerber—between a state and a private claimant—is not always determinative.

But, as noted, Route 21's bid for specific performance fails for a more fundamental reason, which is that Route 21 has not obtained an injunction under a statute that bars it from seeking reimbursement for clean-up costs. Rather, Route 21 seeks specific performance based on a private contract that has been breached, but which lacked any such bar. And the Seventh Circuit's analysis in *AM International* reinforces that this distinction is decisive. The claimant there had obtained a clean-up order under RCRA's private cause of action, which did not allow the claimant to do the clean-up work itself and then seek reimbursement. *Id.* at 1348. The Seventh Circuit recognized that "[w]hether a cleanup order can be discharged in bankruptcy depends on whether the order can be converted into a monetary obligation. Only orders which can be turned into a 'right to payment' are considered dischargeable 'claims' for bankruptcy purposes." *Id.*

For these reasons, these environmental injunction cases cannot carry the day for

Route 21.

### b)  Other Equitable Remedies

A similar distinction inheres outside the context of environmental clean-up injunctions.

Several courts have held that a claimant's right to certain equitable remedies constitutes a

"claim" if an award of monetary damages is a "viable alternative" to the equitable remedy

sought.[11]  *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 305 (3d Cir. 1999); *see also Kennedy*

*v. Medicap Pharms., Inc.*, 267 F.3d 493, 497 (6th Cir. 2001); *In re Udell*, 18 F.3d 403, 408 (7th

Cir. 1994); *In re The Ground Round, Inc.*, 335 B.R. 253, 263 (B.A.P. 1st Cir. 2005).  Courts have

found claimants' rights to equitable relief to be non-dischargeable in contexts where monetary

relief is unrealistic or incalculable such as: an injunction for breach of a covenant not to compete,

*see Kennedy*, 267 F.3d at 496–97 (collecting cases finding that such claims are and are not

dischargeable, but siding with the latter position); *In re Udell*, 18 F.3d at 408 (same); an

equitable demand for reinstatement of a partnership interest, *see In re Ben Franklin*, 186 F.3d at

306–07; and equitable cancellation of liens, *see In re Irizarry*, 171 B.R. 874, 878 (B.A.P. 9th Cir.

1994) (noting that this relief did not rise from failure of performance under contract).

Rejection of an executory contract in bankruptcy does not leave the creditor without a

remedy; the remedy of specific performance is typically converted into a damages claim, to be

considered alongside the monetary claims of other creditors as against the bankruptcy estate.  *See*

*Moglia v. Pac. Emp'rs. Ins. Co. of N. Am.*, 547 F.3d 835, 837 (7th Cir. 2008) ("[R]ejection does

not avoid the debtor's obligations but simply replaces specific performance with damages."); *In*

---

[11] This principle is consistent with the environmental injunctions cases, because in those instances where the statutory source of the injunction does not allow for reimbursement, monetary damages is manifestly not an "alternative" to the equitable remedy sought.

*re Continental Airlines*, 125 F.3d 120, 133–36 (3d Cir. 1997); *Lubrizol Enters., Inc. v. Richmond*

*Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985) (stating that, upon rejection of an

executory contract, claimant "would be entitled to treat rejection as a breach and seek a money

damages remedy; however, it could not seek to retain its contract rights in the technology by

specific performance even if that remedy would ordinarily be available upon breach of this type

of contract"); *In re A.J. Lane & Co., Inc.*, 107 B.R. 435, 439 (Bankr. D. Mass. 1989)

("[R]ecognition of the doctrine and allowance of specific performance against a debtor in

bankruptcy proceedings would be to prefer one creditor over others."); *In re Waldron*, 36 B.R.

633, 642 n.4 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance as a

remedy resulting from the rejection of an executory contract.").  *But see In re The Ground*

*Round*, 335 B.R. at 262 (specific performance of landlord's right to license retransfer provision

in lease not discharged).

> One of the cases that Route 21 relies on, *Apex Oil*, explains:

> The natural reading of [§ 101(5)(B)] is that if the holder of an equitable claim can,
> in the event that the equitable remedy turns out to be unobtainable, obtain a
> money judgment instead, the claim is dischargeable.  If for example you have a
> decree of specific performance (a type of injunction and therefore an equitable
> remedy) that you can't enforce because the property that the decree ordered the
> defendant to sell you was sold to someone else (from whom, for whatever reason,
> you cannot recover it), you are entitled to a money judgment for the value of the
> property . . . and your claim to that value is a claim to a right to receive payment
> and is dischargeable in the seller's bankruptcy.

579 F.3d at 736 (citation omitted).  And the discharge of claims capable of being converted into

damages claims accords with the goals of reorganization under the bankruptcy statute.  A

debtor's ability to reject executory contracts assists reorganization because it "provides the

trustee or debtor-in-possession with the means to relieve the estate of the duty to perform on

burdensome obligations at the expense of all of the estate's other creditors."  *In re Ames Dep't*

21

*Stores, Inc.*, 306 B.R. 43, 52 (Bankr. S.D.N.Y. 2004).  Broadly requiring the debtor to

specifically perform executory contracts would defeat this purpose.  *See id.*; *see also In re*

*Bradlees Stores, Inc.*, 194 B.R. 555, 558 (Bankr. S.D.N.Y. 1996); *In re Waldron*, 36 B.R. at 642

n.4; *In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992) ("Specific performance should

not be permitted where the remedy would in effect do what § 365 meant to avoid, that is, impose

burdensome contracts on the debtor.").  Thus, claims to specific performance, unlike other

equitable obligations such as an injunction enforcing a covenant not to compete, generally give

rise to "claims" that can be discharged in bankruptcy.

### c)  Route 21's Claims Can Be Monetized

In a related argument, Route 21 contends that specific performance is not dischargeable

where, as is allegedly the case here, damages cannot be accurately estimated.  That too is wrong.

Although estimations are often imprecise, the Bankruptcy Code specifically contemplates using

them: "There shall be estimated for purpose of allowance . . . any right to payment arising from a

right to an equitable remedy for breach of performance."  11 U.S.C. § 502(c)(2); *see also* H.R.

Rep. No. 95-595, at 354 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6310; S. Rep. No. 95-

989, at 75 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5851 (stating that § 502(c) "requires the

estimation of any claim . . . for which applicable law provides only an equitable remedy, *such as*

*specific performance*.  This subsection requires that all claims against the debtor be converted

into dollar amounts." (emphasis added)); *In re Manville Forest*, 209 F.3d at 129 ("[T]he fact that

[claimant] did not know the specific parameters of its liability does not place that liability outside

of the definition of "claim.")).  And in *Kovacs*, the Supreme Court, quoting the statute's

legislative history, noted that:

> [I]n some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a "claim" for purposes of a proceeding under title 11.

469 U.S. at 280 (quoting 124 Cong. Rec. 32393 (1978) (remarks of Rep. Edwards)).  Notably, the state relevant here, New Jersey, is such a state.  Under New Jersey law:

> The "right to the equitable remedy of specific performance turns upon the existence of an adequate remedy at law; and the adequacy of the legal remedy of compensation depends upon the facts and circumstances of the particular case . . . ."  Generally, the remedy at law is said to be inadequate in two situations: (1) where damages would be insufficient because the subject matter of the contract is of such a special nature that it resists translation into quantitative terms . . . or (2) where "damages are impracticable" because "it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty."

*First Nat'l State Bank of N.J. v. Commonwealth Fed. Sav. & Loan Assoc. of Norristown*, 610 F.2d 164, 172 (3d Cir. 1979) (internal citation omitted) (quoting *Fleischer v. James Drug Stores, Inc.*, 1 N.J. 138, 146 (1948)).

To the extent that Route 21 implies that the debtor's obligations cannot be monetized, it is incorrect.  This is not a situation in which fairly quantifying obligations under an executory contract is impossible.  Quite the contrary, in the portion relevant here, Route 21's contract with the debtor largely takes the form of an indemnity obligation:  Route 21 agreed to perform certain work, and the debtor agreed to reimburse it for 25% of that cost.  Specific performance of that obligation inherently occurs by means of a monetary payment.  To be sure, the debtor also has non-indemnity obligations under the agreements—such as monitoring the wells and signing off on disposal sites—but these are not incapable of estimation in monetary terms.  Finally, even if the debtor were obligated under the agreement to perform groundwater remediation work—an obligation that is contingent under the agreement, as it is triggered by a sale to Lowe's—this

obligation too can be reasonably monetized.  Indeed, Route 21 gave its own estimates of this

obligation, *see* AR 7, 16, which were consistent with the debtor's estimate, *see* AR 24, Ex. C

at 3.  Accordingly, Route 21 has not established that damages are not a "viable alternative" to

performance of the agreements.  *See In re Nickels Midway Pier, LLC*, 255 F. App'x 633, 638 (3d

Cir. 2007) (Ambro, J.) (claimant has a "claim" that is dischargeable where "damages available

under New Jersey law present an alternative to equitable relief under the facts of this case").[12]

And although Route 21 may *prefer* the remedy of specific performance, it cannot compel such a

remedy here.  *See In re Nickels Midway Pier, LLC*, 341 B.R. 486, 500 (D.N.J. 2006), *aff'd* 255 F.

App'x 633 (3d Cir. 2007) ("The fact that a creditor's specific performance remedy is preferable

to a damages remedy does not mean that a creditor's right to specific performance cannot be

reduced to a claim in bankruptcy.").

　　For all these reasons, Route 21 has a "claim" within the meaning of section 101(5)(B)

with regard to the debtor's contractual obligations to it.  Judge Gerber therefore correctly denied

Route 21's cross-motion for specific performance of the agreements.

### B.  Administrative Priority

　　Route 21's amended claim seeks $1,133,526.66 in administrative expenses.  AR 7.  The

majority of these costs were incurred before the date of the debtor's bankruptcy filing, January 6,

2009.  But at least some costs were incurred post-petition.  *See* Appellant Br. 23 (estimating that

it spent $249,451.94 post-petition).  Route 21 challenges Judge Gerber's ruling that "no part of

---

[12] *In re Ter Bush* is not to the contrary.  There, an arbitrator's award for specific performance of
a land contract was held to not be a claim, because a California law supplied a conclusive
presumption that money damages were inadequate.  273 B.R. 625, 628 (Bankr. S.D. Cal. 2002).

Route 21's claim is entitled to administrative priority treatment." Op. 15. For the following reasons, that ruling is affirmed.

Section 507 of the Bankruptcy Code "defines those expenses and claims against a bankrupt estate that are entitled to priority in a bankruptcy proceeding." *Trs. of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986); *see* 11 U.S.C. § 507. "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *McFarlin's*, 789 F.2d at 100. First priority, after certain domestic support obligations that are not relevant here, goes to administrative expenses, *see* 11 U.S.C. § 507(a)(2), which are defined as including "the actual, necessary costs and expenses of preserving the estate including . . . commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A)(i). Administrative expenses merit priority over the estate's pre-petition debts because otherwise few persons or entities would do business with the post-petition debtor, impeding the trustee's efforts to rehabilitate the business for the benefit of the estate's creditors. *See McFarlin's*, 789 F.2d at 101.

An expense is administrative only (1) if "it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession," and (2) "to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *McFarlin's*, 789 F.2d at 101 (citation omitted); *see also In re Ames*, 306 B.R. at 55 n.28 (collecting cases that apply this two-part test). Route 21's claimed expenses fail to meet both prongs.

First, the expenses incurred by Route 21 do not "arise out of" a post-petition transaction between Route 21 and the Trustee. They arise out of the agreements between Route 21 and the

25

debtor, executed years before the petition's filing.  That Route 21 continued to incur post-petition

costs under these agreements does not change this.  *See In re Manville Forest*, 209 F.3d at 129

(where debtor had signed pre-petition indemnification agreement, "[t]he fact that the contingency

in this case—the environmental liability claim against [claimant]—materialized post-petition

does not transmogrify the claim into a post-petition claim"); *In re Old Carco LLC*, 424 B.R. 650,

657 (Bankr. S.D.N.Y. 2010) ("[W]here there is a pre-petition contract or lease, and the

consideration supporting the claim is supplied pre-petition, court have [sic] determined that those

claims are not entitled to administrative priority, even if the right to payment arises post-

petition." (citing *McFarlin's*, 789 F.2d at 101–04)); *In re G-I Holdings, Inc.*, 308 B.R. 196, 210

(Bankr. D.N.J. 2004) ("The fact that the Debtor's obligation to indemnify the [claimant]

continues to accrue post-petition does not transform the obligation into an administrative

expense.").

Second, the expenses incurred by Route 21 are not "beneficial" to the debtor's estate,

because the debtor did not own or operate the Site at any point post-petition.  "In general, only

those costs incurred to cleanup property for which an estate has an interest in or owns may

qualify as administrative expenses."  *In re Insilco Techs., Inc.*, 309 B.R. 111, 115 (Bankr. D. Del.

2004); *see id.* at 115–16 (costs incurred in remediating pollution at property not owned by debtor

at any time post-petition do not benefit estate); *see also In re Dant & Russell, Inc.*, 853 F.2d 700,

709 (9th Cir. 1988) (clean-up costs arising from pre-petition activities not entitled to

administrative expense priority (citing *Kovacs*, 469 U.S. at 283–83, and *Southern Ry. Co. v.*

*Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985))).

In support of its bid for administrative priority, Route 21 declares that "the Second

Circuit and the First Circuit have considered environmental remediation costs for cleanup of

hazardous materials to benefit the estate[,] i.e.[,] entitled to administrative priority even though the debtors therein no longer owned the property."  Appellant Reply Br. 9 n.8 (citing *In re Chateaugay*, 944 F.2d at 1010, and *In re Hemingway*, 993 F.2d 915, 929 (1st Cir. 1993)).  But that is wrong.  In *Chateaugay*, the Second Circuit affirmed the district court's ruling that "all clean-up costs assessed post-petition *with respect to sites currently owned by* [the debtor] where there has been a pre-petition release . . . of hazardous wastes will be entitled to administrative priority."  944 F.2d at 1009 (emphasis added).  The Court's ruling that such costs "are necessary to preserve the estate in the sense that they enable the estate to maintain itself in compliance with applicable environmental laws" has no relevance here, where the debtor did not own the Site at any point post-petition.  *Id.* at 1009–10.

Route 21 similarly misreads *Hemingway*.  There, the claimant had purchased a facility from the debtor's estate after the debtor had filed for bankruptcy.  993 F.3d at 928.  The court agreed with the trustee that any CERCLA response costs incurred by the claimant would not necessarily benefit the estate, both because the estate no longer owned the contaminated facility and because the estate remained jointly and severally liable to the EPA.  *Id.* at 929–30. However, the court assumed that, while negotiating the post-petition sale of the facility from the estate to the claimant, the parties had been aware that the estate could remain liable under CERCLA for response costs later incurred by the claimant.  *Id.* at 930.  Accordingly, the court stated:

> [T]o the extent that the $1.6 million purchase price for the facility presumptively reflected the parties' allocation of the risks relating to these contribution costs, the $1.6 million constituted "consideration" supporting [the claimant's] right to payment for contribution for response costs from the estate.  Obviously, this substantial infusion of cash benefitted the chapter 11 rehabilitation effort.

27

*Id.*  Put differently, while the response costs in and of themselves may not have benefited the

estate, the court recognized that estate had been benefited by the post-petition $1.6 million

infusion of cash, and the consideration for that infusion was the claimant's right to contribution.

The response costs later incurred by the claimant were "a mere maturation of that right," and

therefore could be treated as administrative expenses.  *Id.*  No such arrangement is present here.

      Because the expenses incurred by Route 21 in cleaning up the site neither arise from a

post-petition transaction with the estate, nor are beneficial to the estate, they are not entitled to

administrative priority treatment.

### C.  Section 502(e)(1)(B)

      Having determined that no part of Route 21's claim for clean-up costs is entitled to

administrative priority treatment, Judge Gerber addressed whether it would be allowed as a

general unsecured claim.  Judge Gerber found, without objection from the Trust, that Route 21

had a valid general unsecured claim with respect to costs already incurred.[13]  Op. 19.  Neither

party challenges that ruling here.

      However, Judge Gerber disallowed Route 21's claim, to the extent it is based on future

costs, under 11 U.S.C. § 502(e)(1)(B).  Op. 25.  Route 21 appealed that decision to this Court

and contested it in its briefs.  However, at oral argument, Route 21 abandoned its claim for future

clean-up costs:

> The Court:  OK.  Let me ask you what I think is a related question here.  You are
> seeking specific performance of the debtor's obligation to do remedial work.  I
> understood you also to be seeking, again relying on that same document, about
> $1.65 million in future cleanup costs.  Is that correct?

---

[13] Because Route 21's claims were not clear about what that amount was, Judge Gerber directed
the parties to settle an order reflecting an allowed claim for the amount of past response costs,
*see* Op. 21, which the parties later stipulated to be $1,019,358.40, *see* AR 15 at 2.

Mr. Klock:  No, I am not seeking $1.65 million because I don't know how much it is going to cost to do this.

Tr. 12–13; *see also id.* at 3, 6 ("There are two separate components to Route 21's appeal.  The first is that the debtor agreed to remediate the property it contaminated and it is this agreement and its addendum that Route 21 seeks specifically to enforce. . . . The second has to do with the expenses we incurred [in getting the NFA and the RAW approval]."); *id.* at 24 ("Two separate components.  One is the monies we have spent, and the other is specific performance.").  These statements obviate the need to consider Route 21's final argument.  *See In re Matthews*, 714 F.2d 223, 224 n.1 (2d Cir. 1983) (declining to consider issues abandoned during oral argument); *U.S. Specialty Ins. Co. v. Liberty Partners, L.P.*, No. 11 Civ. 3736 (HB), 2011 WL 5428971, at *5 n.2 (S.D.N.Y. Nov. 8, 2011) (same); *In re Rainbow Trust*, 216 B.R. 77, 83 (B.A.P. 2d Cir. 1997) (same, in context of bankruptcy appeal).

Nevertheless, in the interest of thoroughness, the Court also affirms Judge Gerber's ruling on the merits, for the reasons that follow.

The Bankruptcy Code provides that "the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on . . . the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim."  11 U.S.C. § 502(e)(1)(B).  Section 502(e)(1)(B) was enacted to "prevent[] competition between a creditor and his guarantor for the limited proceeds in the estate."  H.R. Rep. 95-595, at 354 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6310; S. Rep. No. 95-989, at 65 (1978), 1978 U.S.C.C.A.N. 5787, 5851; *see also In re Hemingway*, 993 F.2d at 923 ("The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against insolvent estates in violation of the

fundamental Code policy fostering equitable distribution among all creditors of the same class.").

Section 502(e)(1)(B) requires disallowance of a claim where three elements are established:

> First, the claim must be for reimbursement or contribution.  Second, the party asserting the claim must be 'liable with the debtor' on the claim.  Third, the claim must be contingent at the time of its allowance or disallowance.

*In re Parmalat Secs. Litig.*, 472 F. Supp. 2d 582, 587 (S.D.N.Y. 2007) (quoting *In re Drexel Burnham Lambert Group Inc.*, 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992)); *see also Aetna Cas. & Surety Co. v. Georgia Tubing Co.*, No. 93 Civ. 3659 (LAP), 1995 WL 429018, at *2 (S.D.N.Y. 1995) (same); *In re Lyondell*, 442 B.R. 236, 243 (Bankr. S.D.N.Y. 2011) (same). Each of these elements is met here.

First, Route 21 argues that its claim is "in the nature of restitution or indemnity," and therefore is not a claim for reimbursement or contribution.  Appellant Br. 20.  Judge Gerber held that "the concept of reimbursement includes indemnity, and claims for indemnification fall within the scope of this prong of section 502(e)(1)(B)."  Op. 18.  The Court agrees.  As Judge Gerber noted, Black's Law Dictionary defines "reimbursement" as: "1. Repayment. 2. Indemnification."  *Black's Law Dictionary* 1399 (9th ed. 2009).  Similarly, "indemnity" is defined as: "3. Reimbursement or compensation for loss . . . Cf. Contribution."  *Id.* at 837. Further, a reading of the terms "reimbursement or contribution" that includes indemnity comports with the goal of section 502(e)(1)(B)—avoiding double liability:

> The use of the word "reimbursement" in the statute cannot be viewed as accidental.  It is a broad word which encompasses whatever claims a codebtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable.  Had Congress meant to limit section 502(e)(1)(B) to claims for indemnification, it could easily have said so. To hold that [] direct claims for fraud and breach of contract seeking the same relief as the claims for indemnity or contribution are not claims for reimbursement would emasculate section 502(e)(1)(B).

30

*In re Wedtech Corp.*, 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988); *see also In re Lyondell*, 442 B.R. at 256; *In re Amatex Corp.*, 110 B.R. 168, 171 (Bankr. E.D. Pa. 1990) ("Congress clearly meant to include all situations wherein indemnitors or contributors could be liable with the debtor within the scope of § 502(e)(1)(B)."). Regardless of the label Route 21 puts on its claim, in substance it seeks from the debtor the repayment of money that Route 21 has expended on account of a debt for which they are both liable. Route 21's claim thus falls within the scope of "reimbursement or contribution."

Second, Route 21 disputes that it is co-liable with the debtor for clean-up of the site, because, it claims, it is an "innocent purchaser."[14] Appellant Br. 18–20; Appellant Reply Br. 9. However, in pressing its claims, Route 21 has repeatedly asserted that it faces extensive liability for such cleanup. *See, e.g.*, Appellant Br. 11; Tr. 11; Op. 22–23 (collecting assertions by Route 21 that it faced extensive liability). In essence, Route 21 has taken contradictory positions before both this Court and the bankruptcy court, arguing (in the service of its contention that specific performance by the debtor was required) that it faces untold liability, while arguing (in the

---

[14] Route 21 again overstates its case. Route 21 asserts that: "The State of New Jersey declared Route 21 an Innocent Purchaser of the Site." Appellant Br. 18. But although Route 21 cites the Brownfield Agreement for that proposition, the Agreement does not so state. Rather, it provides that "Route 21 . . . advised the Commission that it performed an environmental due diligence investigation of the Site, prior to acquiring it, and Route 21 . . . has certified in the attached Certification that it is not a person deemed liable for the contamination at the Site." AR 9, Ex. D. In other words, the agreement states that Route 21 has assured New Jersey that it is an innocent purchaser, not that New Jersey has made that determination. Moreover, although Route 21 asserts that it meets the requirements of 42 U.S.C. § 9601(35)(A)(i), such that it could avoid liability under § 9607(a), *see* Appellant Br. 19, that assertion contradicts Route 21's insistence that it faces liability under CERCLA, as well as the stipulation which, as discussed *infra*, presumes liability.

service of its contention that its claim for future costs should be allowed) that it is *not* liable. Route 21 cannot have it both ways.[15]

Moreover, as the record reflects, NJDEP and Route 21 have stipulated that any claims allowed as to the Site will be treated as one claim and apportioned between them, *see* AR 5, and NJDEP's claim for clean-up costs at the Site has already been allowed against the estate, *see* AR 25 at 2.  By Route 21's own description, "the purpose of the Stipulation was to insure that only one not two claims would be made for the Site, *i.e.* no double recovery."  AR 9 at 8.  That stipulation presupposes co-liability:  There is no reason to consolidate claims to prevent double recovery if Route 21 had no co-liability.  Route 21's implicit proposal that two claims for clean-up costs at the Site should be allowed is classic "double-dipping," which is precisely what both the stipulation and section 502(e)(1)(B) aim to prevent.  *In re Hemingway*, 993 F.3d at 923;[16] *see*

---

[15] Although it is far from pellucid as to this point, Route 21 appears to suggest one explanation for these contradictory assertions—that it does not *currently* face any liability for future clean-up costs, because of its alleged innocent purchaser status; but if it were to take control over disposal of contaminated materials, it would incur liability under CERCLA for any future contamination caused during the disposal process.  Appellant Br. 7, 11; Tr. 9, 11.  But even if this were correct, it would not help Route 21 here.  Route 21 has repeatedly asserted that it has the right to withdraw at any time from its agreement with NJDEP to perform the remediation work, *see, e.g.*, Appellant Br. 9 n.6, 19; Tr. 12, 37, as appears to be true, *see* AR 9, Ex. D ¶ 5.  When pressed at argument as to what Route 21 might do if specific performance were not awarded, counsel for Route 21 stated:  "Well, I would turn to the state and say it's your problem."  Tr. 80.  In essence, Route 21's position is that, were it to receive a cash distribution on account of its claim, it would be at liberty to pocket that money and leave NJDEP with the mess.  But here too, Route 21 cannot have it both ways.  If Route 21 has no liability for future costs, it has no basis for filing a claim against the debtor in the first place.  *See In re Lyondell*, 442 B.R. at 255 ("If the Debtors and [the claimant] are not jointly and severally liable, then [the claimant] would have not a claim against the Debtors in the first place.").

[16] Although the First Circuit in *Hemingway* vacated the bankruptcy court's disallowance of the property owner's claim for future CERCLA response costs, *Hemingway* does not assist Route 21.  There, the EPA had elected not to assert a claim against the debtor, instead choosing to pursue the claimant directly, and neither the trustee nor the claimant had filed a surrogate claim for the EPA.  993 F.2d at 925.  Thus, the court found no risk of "double-dipping" unless and

*also Aetna*, 1995 WL 429018, at *3; *In re Lyondell*, 442 B.R. at 253 ("Because the EPA already has an allowed claim against the Debtors for the [] site, allowing [claimant's] claim would be setting up precisely the redundant recoveries section 502(e)(1)(B) was created to prevent.").

To be sure, Route 21 cites one case which reaches a superficially contrary result, *In re Allegheny International, Inc.*, 126 B.R. 919 (W.D. Pa. 1991), *aff'd without opinion*, 950 F.2d 721 (3d Cir. 1991). In *Allegheny*, the debtor sold a site to the claimant before bankruptcy. After the debtor's bankruptcy, the site's owner filed a claim for past and future environmental remediation costs. The court held that section 502(e)(1)(B) applies only to claims involving joint or secondary, rather than direct, liability. *Id.* at 922. Because the relevant provision of CERCLA, 42 U.S.C. § 9607(a)(4)(B), allowed for a direct action for recovery of response costs incurred by a non-government entity, the claimant had a "direct" claim not covered by section 502(e)(1)(B). *Id.* at 922–23. Accordingly, the court allowed the claim for past and future remediation costs.

There are, however, material differences between this case and *Allegheny*. Importantly, although the *Allegheny* court recognized that the claimant might choose not to do the remediation work, exposing the debtor to double liability if the EPA brought an action against the debtor, the court suggested that this problem could be solved by requiring that any distribution on that claim be placed into a trust to be expended on the remediation of the site. *Id.* at 924. No such solution was proposed here, including by Route 21. Nor would it be necessary, given that Route 21 and

---

until the EPA, or its surrogate, filed a claim against the debtor. *Id.* at 928. That is not the case here, because NJDEP has asserted, and been allowed, a claim for clean-up costs at the Site. The court went on to discuss what the section 502(e)(1)(B) analysis might look like upon remand if the EPA or its surrogate did file a claim, and stated that if the claimant could prove that it was an "innocent landowner," its claim for future response costs should be allowed as an administrative expense. *Id.* at 934. Even assuming Route 21 were an innocent purchaser here, this case is distinguishable, because the claimant in *Hemingway* had an administrative expense claim on account of its post-petition purchase of the property, whereas here Route 21 has no such claim. *See supra* pp. 26–27, 31 n.14.

NJDEP have already avoided the double liability problem by stipulating that they will have one claim to allocate between them. *Allegheny* is also inapposite in that, unlike the claimant in *Allegheny*, Route 21 has not filed a direct claim against the debtor under CERCLA; rather, its claim is based on a contractual agreement. *See In re Cottonwood Canyon Land Co.*, 146 B.R. 992, 995 (Bankr. D. Colo. 1992) ("Any analysis of the effect of section 502(e) on the claim . . . must start with some consideration of the types of claims that might be asserted by [claimant].").

More fundamentally, this Court disagrees with the logic of *Allegheny*, for the reasons given by numerous other courts. *See In re Eagle Picher Indus., Inc.*, 164 B.R. 265, 271 (S.D. Ohio 1994); *In re Lyondell*, 442 B.R. at 253; *In re Drexel Burnham*, 148 B.R. at 988; *In re Cottonwood Canyon*, 146 B.R. at 996. *But see In re Harvard Indus., Inc.*, 138 B.R. 10 (Bankr. D. Del. 1992). Most notably, the *Allegheny* court's holding that the debtor and claimant were not co-liable is inconsistent with that court's own assertion that "both debtor and [claimant] are liable [to the EPA] for the waste remediation." *In re Allegheny*, 126 B.R. at 923. Although the court there distinguished between clean-up work done by the claimant itself and clean-up work performed by the EPA, the fallacy of that distinction for section 502(e)(1)(B) purposes is demonstrated by the court's own solution to the double liability problem. As one court explained:

> The [*Allegheny*] court's use of the trust device establishes the clear character of the claim which was being satisfied. The debtor was not being asked to satisfy a claim for injury to the claimant's property. Had that been the claim, the claimant most assuredly would have had the right to receive outright payments on its claim. Instead, the funds were to be placed in a trust so that they would be used to satisfy the obligation that both the debtor and the claimant had to the EPA for the remediation of the properties. The claimant was liable to the EPA with the debtor for remediation, and the claim clearly should have been disallowed under section 502(e)(1)(B).

*In re Cottonwood Canyon*, 146 B.R. at 996.  That analysis equally applies here.  Despite Route 21's claim to be an innocent purchaser, its contrary assertions about facing steep liability and its stipulation with NJDEP presupposing such liability reflect that what Route 21 really seeks is funds that it could use to undertake clean-up work that Route 21 is liable for.  As Judge Gerber noted, that is the essence of co-liability:  "[t]he more the debtors pay, the less Route 21 is exposed."  Op. 24.  The second prong of section 502(e)(1)(B) is, therefore, established.

Finally, Judge Gerber found that the costs not yet incurred by Route 21 were contingent, despite the fact, emphasized by Route 21, that the pollution had already occurred.  Op. 20–21.  The Court agrees.  "[A] claim is contingent 'if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.'"  *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y. 2001) (quoting *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997)).  "Contingency relates to both payment and liability."  *Aetna*, 1995 WL 429018, at *3 (citing *In re Drexel Burnham*, 148 B.R. at 986–87).  Courts in this District have consistently applied these principles to disallow claims for unknown, future costs under section 502(e)(1)(B), a description that aptly fits the costs that Route 21 may, or may not, face in the future as to clean-up of the Site.  *See, e.g.*, *id.* (surety claim is contingent until claimant "pays the principal creditor and fixes his own right to payment from the debtor");  *Highland Holdings and Zito I, L.P. v. Century/ML Cable Venture*, No. 06 Civ. 181 (GBD), 2007 WL 2405689, at *5 (S.D.N.Y. Aug. 24, 2007) (indemnification claim for liability in as-yet-unresolved litigation is contingent); *In re Alper Holdings USA*, No. 07-12148, 2008 WL 4186333, at *6–7 (Bankr. S.D.N.Y. Sept. 10, 2008) (indemnification claim for liability in as-yet-unresolved environmental litigation is contingent).  And courts have often disallowed such claims in the specific context of reimbursement of future environmental clean-up costs.  *See,*

*e.g.*, *In re APCO Liquidating Trust*, 370 B.R. 625, 636 (Bankr. D. Del. 2007) (disallowing as contingent future environmental costs); *see also In re Lyondell*, 442 B.R. at 246–51 (same). Further, case law from the Second Circuit and others, albeit in the context of determining the existence of a claim rather than when a claim is contingent, confirms that claims for reimbursement of remediation costs are contingent until an underlying payment is actually made. *See In re Lyondell*, 442 B.R. at 247–48 (citing *In re Chateaugay*, 944 F.2d at 1005; *Olin Corp. v. Riverwood Int'l Corp.*, 209 F.3d 125, 129 (2d Cir. 2000); *Cal. Dep't of Health Servs. v. Jensen*, 995 F.2d 925, 930–31 (9th Cir. 1993) (per curiam); *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775, 786 (7th Cir. 1992)).  Thus, Route 21's claim for reimbursement of future clean-up costs is contingent.[17]

  Therefore, Judge Gerber was correct in disallowing Route 21's claim for clean-up costs not yet incurred as of the date of disallowance.

  It is, finally, important to note the practical result of this decision, which is consistent with core principles of bankruptcy law.  Route 21's predicament is a sympathetic one.  It has spent much money remedying pollution that it did not cause, but is left with only a general unsecured claim for some $1 million.  As counsel for the debtor represented at argument, it is possible that Route 21 will receive a distribution from the bankruptcy estate of only 1% of that amount.  Tr. 60.  That outcome may seem harsh, but it treats Route 21 no worse than the debtor's other unsecured creditors, who equally are left holding the bag in the wake of the debtor's

---

[17] This outcome is sensible.  First, NJDEP may have several means of completing and funding the work of remediating the underlying pollution, and these may, or may not, call for Route 21 to spend the money for which it now seeks reimbursement.  *See In re Lyondell*, 442 B.R. at 249.  Second, disallowance of claims for clean-up costs not yet incurred gives parties the incentive to clean up pollution quickly, lest their claim be disallowed, thereby furthering CERCLA's goal of speedy clean-up.  *Id.* at 251; *In re APCO*, 370 B.R. at 636–37.

bankruptcy.  *See Dewsnup v. Timm*, 502 U.S. 410, 435 (1992) (Scalia, J., dissenting) ("[A]
bankruptcy law has little to do with natural justice.").  Thus, "[l]ike so many matters in chapter
11 cases . . . this controversy is not in economic reality a controversy between creditors . . . and a
debtor.  Rather, it is a controversy between one group of creditors . . . and the [debtor's] *other*
creditors, with respect to the allocation of the [debtor's] limited resources to satisfy losses that
many creditors will suffer."  *In re Ames*, 306 B.R. at 54 (emphasis in original).

Stripped to their essence, Route 21's arguments to the bankruptcy court and this Court
are attempts to skip the line of creditors and get paid in whole dollars—whether by obtaining
specific performance or by receiving administrative priority.  But although allowing Route 21 to
do so would make little difference to the liquidating debtor, the practical effect of such a ruling
would be to further injure the debtor's other creditors.  Some of these creditors—whether tort
victims, vendors, employees, or others—have sympathetic circumstances of their own.  On the
record before the Court, there is no legal basis for allowing Route 21 to skip ahead of these other
unsecured creditors.

## CONCLUSION

For the foregoing reasons, the bankruptcy court's ruling is affirmed.  The Clerk of Court is respectfully directed to close this case.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: December 19, 2012
      New York, New York